318 Ga. 511
FINAL COPY

S23A1091. PALMER v. THE STATE.

BOGGS, Chief Justice.

Appellant Willie Williams Palmer challenges his 2023 convictions for malice murder and other crimes in connection with the shooting deaths of his estranged wife, Brenda Jenkins Palmer, and his 15-year-old stepdaughter, Christine Jenkins. He contends that his Sixth Amendment right to a speedy trial was violated; that the State's loss or destruction of potential biological evidence from the crime scene required dismissal for prosecutorial misconduct or an instruction allowing the jury to draw an inference adverse to the State; that the trial court violated his constitutional right to present a defense by excluding evidence of "historical bias against him on the part of local law enforcement and prosecutors"; that the court erred in prohibiting him from questioning the lead GBI investigator about a shooting two months after the murders to support his theory of an alternative suspect and his argument that the investigators

unfairly focused on him as the shooter to the exclusion of other possible suspects; and that the cumulative effect of the court's errors deprived him of a fundamentally fair trial. For the reasons that follow, we affirm.[1]

---

[1] The crimes occurred on the night of September 10, 1995. On April 17, 1996, a Burke County grand jury indicted Appellant on two counts of malice murder, two counts of felony murder, and one count each of burglary, kidnapping, child cruelty, possession of a firearm during the commission of a crime, and possession of a firearm by a convicted felon. Appellant's first trial in April 1997 ended in a mistrial.

At Appellant's second trial in late October and early November 1997, the jury found him guilty of all charges, and he was sentenced to death. He appealed, and this Court affirmed. See *Palmer v. State*, 271 Ga. 234 (517 SE2d 502) (1999). Appellant then filed a petition for habeas corpus, which the habeas court granted, and this Court affirmed the grant of habeas relief. See *Schofield v. Palmer*, 279 Ga. 848 (621 SE2d 726) (2005).

At Appellant's third trial in August 2007, he was again found guilty of all charges and sentenced to death. Appellant filed a motion for new trial, which he amended in 2014, 2015, and 2016. In November 2019, the trial court denied the motion. The trial court granted Appellant's request for a 30-day extension of time to file a notice of appeal, and in January 2020, Appellant filed a timely notice of appeal.

In August 2020, this Court granted the parties' Joint Motion to Vacate the Denial of Motion for New Trial and Remand to Enter Consent Judgment Granting a New Trial. On December 14, 2020, the remittitur from this Court was filed in the trial court. On July 7, 2021, the trial court entered a Consent Order Granting Defendant's Motion for New Trial.

At Appellant's fourth trial from February 2 to 15, 2023, the jury found him guilty of all charges and determined that he is not a person with intellectual disability. On February 15, 2023, the trial court sentenced Appellant to serve consecutive terms of life in prison without the possibility of parole for the malice murders, concurrent terms of 20 years each for burglary, kidnapping, and child cruelty, a concurrent term of five years for possession of

1. The evidence at Appellant's fourth trial showed as follows. Appellant married Brenda Jenkins Palmer in May 1993, and they had a daughter, Willshala, in 1994. In May 1995, Brenda Palmer separated from Appellant and filed for divorce, and the following day, Appellant was served with a restraining order to stay away from her. Meanwhile, Brenda Palmer stayed with family and at some point moved with her daughters, 15-year-old Christine and one-year-old Willshala, into a two-room house in Vidette. Appellant owned five acres of land and told numerous people that he would kill Brenda Palmer if she tried to take it from him.

On July 31, 1995, Appellant was arrested for violating the restraining order and put in jail. At the end of August 1995, Brenda Palmer met with the manager of a small loan company to catch up on her payments and update her address. She was very nervous and

---

a firearm by a convicted felon, and a consecutive term of five years for possession of a firearm during the commission of a crime; the felony murder counts were vacated by operation of law. On the same day, Appellant filed a timely notice of appeal. The case was docketed in this Court to the August 2023 term and was orally argued on October 26, 2023.

upset during the meeting, and the manager promised not to give out her address to anyone.

On September 1, 1995, Appellant was released from jail, and he immediately went to the same small loan company to borrow money to pay a lawyer. He asked the manager if she had seen Brenda Palmer, and the manager did not reply. He then asked the manager if she knew where Brenda Palmer was living, and again the manager did not reply. Appellant told the manager twice that she did not have to tell him where Brenda Palmer was, because "I will find her. And, when I do, I'll kill that b**ch." Appellant's demeanor was "cold" and "hard," and he looked different than the manager had ever seen him before.

Appellant also was angry with Brenda Smith. Appellant and Brenda Smith had been in a relationship for 12 to 14 years before Appellant married Brenda Palmer, and Appellant and Brenda Smith had three children together. When Brenda Palmer moved out and filed for divorce, Brenda Smith moved back in with Appellant. On September 7, 1995, Appellant told Emma Ruth Brown that he

was going to "kill all the Brendas," that he was going to do it "execution style," and that she would "see it on TV."

On the afternoon of Sunday, September 10, 1995, Brenda Smith's niece, Letrichia Smith, overheard Appellant ask his nephew, Frederico Palmer, and his son, Wilbur Palmer, where his gun was. Appellant said that he was "going to kill . . . the two Brendas." Appellant then went and spoke with Brenda Smith, who seemed afraid afterward. Not long after that, Appellant got into his car and chased Brenda Smith, who was a passenger in her sister's car, and Appellant ran into the back of the car. Brenda Smith fled her sister's car on foot, and Appellant angrily approached her sister and told her that she "didn't know who the f**k [she] was messing with."

That night, Appellant met up with Frederico at a club in Gough called Soul City and asked Frederico to ride with him to Augusta. Frederico agreed and got into Appellant's blue Chevy Caprice, but Appellant drove toward Vidette instead of Augusta. Appellant asked

Frederico, "Do you think I should kill Brenda and Christine?" Frederico did not answer.

When they got to Vidette, Appellant parked his car on the side of the road near the Vidette Country Store, which was close to Brenda Palmer's house. Appellant put on gloves, pulled out his .22-caliber rifle, and exited the car. At Appellant's direction, Frederico parked the car near some dumpsters and caught up to Appellant on foot outside Brenda Palmer's house. At Appellant's request, Frederico disconnected the telephone line on the side of the house, making the telephone inside the house inoperable.

Appellant then went to the front door, knocked twice, and when there was no answer, he kicked in the door and turned on the light. Christine, whose nickname was "Bootie," was sleeping on a bed in the living room, and Appellant called out, "Bootie, I told y'all I was coming back." Appellant shot Christine once in the face with the rifle, killing her. Appellant then went into the back room, where the telephone receiver was off the hook and Brenda Palmer was holding Willshala. Appellant directed Frederico to take the baby, and

6

Frederico complied, knocking Brenda Palmer to the floor. Frederico took the baby outside, and Appellant shot Brenda Palmer twice in the head, killing her. Frederico came back inside and, at Appellant's direction, put the baby down and checked to see if Brenda Palmer had a pulse; she did not. Appellant and Frederico turned out the light and left, leaving Willshala in the house.

Frederico went and got the car and picked up Appellant. Appellant concocted an alibi, telling Frederico to say that they had driven straight from Gough to Augusta, where they spent the evening visiting Belle Walker. Appellant and Frederico drove to Appellant's house, where Appellant changed clothes, before driving on toward Augusta. Along the way, they stopped at Brushy Creek Bridge, where Appellant got out and threw his rifle and the gloves and shoes that he was wearing at the time of the murders over the side of the bridge. Later, they stopped at a gas station for cigarettes before going to Walker's apartment, where they knocked on the door, but no one answered. Appellant and Frederico then drove back to Gough. That night, Frederico told Kelvin Jenkins what had

happened and said that he was scared that Appellant was going to kill him.

At around 7:00 a.m. on Monday, September 11, 1995, Brenda Palmer's sister, Jellen Jenkins, discovered the bodies of her sister and Christine and took Willshala out of the house. Within an hour or so, GBI Special Agent David Leonard began processing the crime scene. He noticed a small amount of a milky white liquid between Christine's legs, but by the time he went to collect it, the substance had dissipated. Agent Leonard wiped the skin in the area with two sterile gauze pads, one dry and one moistened with a saline solution, in an attempt to collect any remnants of the liquid for testing for the presence of seminal fluid. The gauze pads later tested negative for seminal fluid.

At noon on the day the bodies were discovered, the lead GBI investigator, Special Agent Anthony Williamson, interviewed Appellant at the Burke County Sheriff's Office. Appellant said that the night before, he met up with Frederico a little after 9:00 p.m. According to Appellant, Frederico then rode with him to Augusta in

8

Appellant's blue Chevy Caprice to see a woman, who was not home, so they drove back to Gough, arriving around 12:55 a.m. At 3:30 p.m. on September 11, 1995, Agent Williamson interviewed Frederico, who related essentially the same story as Appellant about riding to Augusta the prior evening.

On September 13, 1995, Agent Williamson interviewed Frederico again. Frederico confessed his involvement with Appellant in the murders and then led law enforcement officers to Brushy Creek Bridge, where they recovered a rifle from the creek below. Two days later, Frederico told Agent Williamson that Appellant threw the gloves and shoes that he was wearing at the time of the murders over the side of the bridge along with the rifle, and the gloves and shoes were then recovered. The shoes from the creek matched Appellant's shoe size.

Ballistics testing showed that two shell casings found at the crime scene were fired from the rifle recovered from the creek and that the bullet removed from Christine's skull during an autopsy, half of which was missing, "was probably fired from that gun." The

9

same rifle had been temporarily confiscated from Appellant during a traffic stop in 1992.

Randy Waltower, a paid confidential informant for the GBI in drug operations, identified Appellant's car as having been in the area near Brenda Palmer's house on the night of the murders. Appellant's car was easily recognizable, because it was missing part of its front grille. Thomas Parrish was with Waltower and also saw Appellant's car. Pamela Parker, who worked at the Vidette Country Store, confirmed that Waltower and Parrish were in the area that night. Frederico saw Waltower as well. The GBI later paid Waltower $500 for the information he provided about Appellant and for his assistance in two other matters.

On September 19, 1995, GBI Special Agent Robert Ingram, Agent Williamson's supervisor, interviewed Appellant, who denied any involvement in the murders. Near the end of the interview, Agent Ingram asked Appellant if he had "spoken to the Lord about what he had done," and Appellant said that he had. Agent Ingram asked Appellant, "[D]id you tell the Lord the truth when you talked

10

to him?" Appellant said that he did. Agent Ingram then asked if that was different from what Appellant had told the investigators, including Agent Ingram, and Appellant said, "Yeah, it was different." At that point, Appellant said that he wanted to go back to his jail cell, and Agent Ingram ended the interview.

The following month, on October 26, 1995, Frederico pled guilty to two counts of felony murder and was sentenced to serve two consecutive terms of life in prison. In exchange for his plea, Frederico agreed to cooperate fully and testify truthfully against Appellant.

2. Appellant contends that the trial court erred in rejecting his claim that the State violated his Sixth Amendment right to a speedy trial. We disagree.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." Sixth Amendment speedy trial claims are analyzed under the two-part framework set out in *Barker v. Wingo*, 407 U.S. 514 (92 SCt 2182, 33 LE2d 101) (1972), and *Doggett*

11

*v. United States*, 505 U.S. 647 (112 SCt 2686, 120 LE2d 520) (1992).

First, the trial court must determine whether the delay at issue was sufficiently long to be considered presumptively prejudicial. See *Barker*, 407 U.S. at 530-531; *Doggett*, 505 U.S. at 651-652 & n.1. If not, the claim fails at the threshold. See *Ruffin v. State*, 284 Ga. 52, 55 (663 SE2d 189) (2008) (citing *Barker*, 407 U.S. at 530; *Doggett*, 505 U.S. at 652 n.1). But if the delay has passed the point of presumptive prejudice, the trial court must proceed to the second step of the *Barker-Doggett* analysis. See id.

The second step of the *Barker-Doggett* analysis requires the application of a context-sensitive balancing test to determine whether the defendant has been deprived of his right to a speedy trial. See *Ruffin*, 284 Ga. at 55. The four factors that form the core of this balancing test are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant from the delay. See *Barker*, 407 U.S. at 530; *Ruffin*, 284 Ga. at 56. See also *Doggett*, 505 U.S. at 651 (describing the four core factors as "whether [the] delay before trial

12

was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether [the defendant] suffered prejudice as the delay's result").

Application of the *Barker-Doggett* balancing test to particular cases is committed to the sound discretion of the trial courts. See *Heard v. State*, 295 Ga. 559, 563 (761 SE2d 314) (2014). Thus, on appeal from a ruling on a speedy trial claim, we accept the trial court's factual findings unless they are clearly erroneous, and we review the trial court's evaluation of each factor and its "balancing of [the] factors — its ultimate judgment" — "only for abuse of discretion." *Williams v. State*, 314 Ga. 671, 678 (878 SE2d 553) (2022).

(a) *Length of the Delay and Presumptive Prejudice.*

(i) The Sixth Amendment speedy trial right "does not attach until . . . a defendant is arrested or formally accused." *Betterman v. Montana*, 578 U.S. 437, 441 (136 SCt 1609, 194 LE2d 723) (2016) (citing *United States v. Marion*, 404 U.S. 307, 320-321 (92 SCt 455,

13

30 LE2d 468) (1971)). Thus, the length of the delay ordinarily is measured from the earlier of the date of the defendant's arrest or indictment (or other formal accusation) to the date that his trial started. See *Ruffin*, 284 Ga. at 55. See also 5 Wayne R. LaFave et al., Criminal Procedure § 18.2 (b) (4th ed. Dec. 2023 update) ("In the usual case, [determining the length of the delay] is simply a matter of calculating the time which has elapsed from when the Sixth Amendment right attached until trial (or, until the pretrial motion to dismiss on this ground is determined)." (footnotes omitted)). However, the Sixth Amendment speedy trial right "detaches upon conviction." *Betterman*, 578 U.S. at 441. See also id. at 442 ("As a measure protecting the presumptively innocent, the speedy trial right . . . loses force upon conviction."). Like delay prior to arrest or indictment, the "adverse consequences of postconviction delay, though subject to other checks [such as due process], are . . . outside the purview of the Speedy Trial Clause." Id. at 444 (cleaned up). See also id. at 448-449 ("The Sixth Amendment speedy trial right . . . does not extend beyond conviction, which terminates the

14

presumption of innocence."). Cf. *Chatman v. Mancill*, 280 Ga. 253, 256 (626 SE2d 102) (2006) ("Substantial delays experienced during the criminal appellate process implicate due process rights." (cleaned up)).

The United States Supreme Court has expressly reserved decision on whether the Sixth Amendment speedy trial right "reattaches upon renewed prosecution following a defendant's successful appeal, when he again enjoys the presumption of innocence." *Betterman*, 578 U.S. at 441 n.2. We have never directly addressed whether the speedy trial right reattaches after a conviction is set aside by the grant of a new trial or reversal on appeal, but we have assumed without deciding that it does reattach. See generally *Jakupovic v. State*, 287 Ga. 205 (695 SE2d 247) (2010) (new trial); *State v. Carr*, 278 Ga. 124 (598 SE2d 468) (2004) (reversal on appeal). When a speedy trial claim is raised following a retrial, the length of the delay is measured from the date of the order granting a new trial or the return of the case from the appellate court to the date that the retrial started. See *Jakupovic*, 287 Ga. at

206 (new trial); *Carr*, 278 Ga. at 126 (reversal on appeal). See also 5 Wayne R. LaFave et al., Criminal Procedure § 18.1 (c) (4th ed. Dec. 2023 update) (stating that "[i]f, following conviction, defendant's motion for a new trial is granted, the length of delay in retrying the defendant is measured from the date that the trial court ruled on defendant's motion," and that "[u]pon appellate reversal of a conviction, the speedy trial clock regarding retrial generally starts as of the time of remand" (internal quotation marks omitted)); 23 CJS Criminal Procedure and Rights of Accused § 798 (Nov. 2023 update) ("The time for speedily bringing a defendant to trial, pursuant to an order granting a new trial, begins to run anew after the order is entered.").

(ii) At Appellant's third trial in 2007, he was found guilty of two counts of malice murder and other crimes and sentenced to death. He filed a motion for new trial, which he amended in 2014, 2015, and 2016. In November 2019, the trial court denied the motion, and he appealed to this Court. On August 7, 2020, the parties filed in this Court a Joint Motion to Vacate the Denial of Motion for New

16

Trial and Remand to Enter Consent Judgment Granting a New Trial. On August 24, 2020, this Court granted the motion, vacated the trial court's order denying Appellant's motion for new trial, and remanded the case to the trial court for further proceedings. On December 14, 2020, the remittitur from this Court was filed in the trial court. On July 7, 2021, the trial court entered a Consent Order Granting Defendant's Motion for New Trial.

The trial court measured the length of the delay from the filing of the remittitur on December 14, 2020, to the start of Appellant's fourth trial on February 2, 2023, a period of approximately two years and two months, and ruled that this delay was presumptively prejudicial. However, this Court did not set aside Appellant's convictions on appeal following his third trial. Instead, we granted the parties' joint motion, vacated the trial court's order denying Appellant's motion for new trial, and remanded the case to the trial court for further proceedings. On July 7, 2021, the trial court entered the parties' consent order granting Appellant a new trial. Only then did Appellant again enjoy the presumption of innocence. Moreover,

until his convictions were set aside by the grant of a new trial, double jeopardy barred him from being retried. See *Currier v. Virginia*, 585 U.S. 493, 501 (138 SCt 2144, 201 LE2d 650) (2018) ("As a general rule, the Double Jeopardy Clause protects against a second prosecution for the same offense after conviction as well as against a second prosecution for the same offense after acquittal." (cleaned up)). The Speedy Trial Clause of the Sixth Amendment did not require the State to attempt to retry Appellant at a time when the Double Jeopardy Clause of the Fifth Amendment barred his retrial. The trial court therefore should have measured the length of the delay from the entry of the order granting him a new trial on July 7, 2021, to the start of his fourth trial on February 2, 2023, a period of approximately one year and seven months.

"One year generally marks the point at which expected deliberateness in the prosecution of a criminal matter turns into presumptively prejudicial delay." *Ruffin*, 284 Ga. at 55 (cleaned up). Thus, the trial court did not err in ruling that the delay at issue was sufficiently long to be considered presumptively prejudicial. And

because the trial court's legal error in measuring the length of the delay favored Appellant, the error does not undermine the reasonableness of the trial court's ultimate judgment denying his speedy trial claim.

(iii) Appellant agrees that the trial court erred in measuring the length of the delay but claims that the error was in the opposite direction. Appellant argues that the trial court should have measured the length of the delay from his arrest on July 31, 1995, to the start of his fourth trial on February 2, 2023, a period of more than 27 years. He notes that his first trial in April 1997 ended in a mistrial when it was discovered that the State had failed to disclose a statement by Frederico that contradicted his trial testimony and that his convictions from his second trial in October and November 1997 were vacated on habeas due to the State's failure to disclose the GBI's $500 payment to Waltower. See *Brady v. Maryland*, 373 U.S. 83, 87 (83 SCt 1194, 10 LE2d 215) (1963) (holding that due process requires the prosecution to disclose to the defense material, exculpatory evidence that is within its possession or control).

19

Appellant also asserts that there was reversible error in his third trial in August 2007 due to the State's failure to disclose that an expert witness who had previously testified that Appellant was not intellectually disabled had since revised his opinion and concluded that Appellant was, in fact, mildly intellectually disabled. Appellant contends that because his first three trials were tainted by prosecutorial misconduct in the form of *Brady* violations, the length of the delay for purposes of his speedy trial claim should include the entire period from his arrest in 1995 to the start of his fourth trial in 2023.

Appellant's argument appears to conflict with precedent from the United States Supreme Court and this Court. See *Betterman*, 578 U.S. at 439 ("We hold that the [Sixth Amendment speedy trial] guarantee protects the accused from arrest or indictment through trial, but does not apply once a defendant has been found guilty at trial or has pleaded guilty to criminal charges."); *Jenkins v. State*, 294 Ga. 506, 510 (755 SE2d 138) (2014) (rejecting argument that because of *Brady* violations at the defendant's first trial, the length

20

of the delay should be measured from the date of the defendant's arrest instead of the date of the remittitur from this Court following affirmance of the habeas court's judgment setting aside the defendant's convictions); *Carr*, 278 Ga. at 126 (measuring the length of the delay "from the return of this case to the trial court after this Court's 1997 reversal of [the defendant's] convictions" where this Court had concluded in the defendant's direct appeal that the record supported several of his allegations of prosecutorial misconduct, see *Carr v. State*, 267 Ga. 701, 711-712 (482 SE2d 314) (1997), overruled on other grounds by *Clark v. State*, 271 Ga. 6, 10 (515 SE2d 155) (1999)). See also *Betterman*, 578 U.S. at 444 ("Adverse consequences of postconviction delay, though subject to other checks, are . . . outside the purview of the Speedy Trial Clause." (citation omitted)). However, we need not decide here whether a series of *Brady* violations resulting in retrials ever justifies consideration of periods of time prior to the grant of a new trial or the setting aside of a defendant's convictions on appeal in evaluating a speedy trial claim. See *Pelletier v. Warden*, 627 A2d 1363, 1372 (Conn. App. Ct. 1993)

21

(suggesting, before *Betterman*, that where the prosecutorial misconduct that resulted in the reversal of the defendant's convictions was "motivated by a desire to cause additional delay or otherwise impair the [defendant's] speedy trial rights," the time prior to the reversal may be included in the length of the delay).

As explained above, after Appellant's third trial, where the jury found him guilty of two counts of malice murder and other crimes and he was again sentenced to death, he appealed to this Court. While his appeal was pending, the parties filed in this Court a Joint Motion to Vacate the Denial of Motion for New Trial and Remand to Enter Consent Judgment Granting a New Trial, which we granted. The remittitur from this Court was filed in the trial court, and on July 7, 2021, the trial court entered a consent order granting Appellant a new trial. Thus, rather than running the risk that at the end of his appeal, this Court might reject his claims and affirm his convictions and death sentence, Appellant decided to enter into an agreement with the State in which the State agreed to the grant of a new trial and not to seek the death penalty at Appellant's fourth

trial, and Appellant agreed to be retried and to be eligible for a sentence of life in prison without the possibility of parole. The parties explicitly agreed to further proceedings "to entail a jury trial as to the question of criminal responsibility and a sentencing determination to be made by the trial court." The proposed consent order attached to the parties' joint motion, which was later entered by the trial court, explained in the first sentence that the order was "[b]ased upon agreement and consent of the parties that *reversible error in the trial proceedings of this matter warrant a new trial*" (emphasis added); specifically referred to "trial proceedings to follow" and a "re-trial"; and referenced a "new trial" three times. Under these unique circumstances, we conclude that Appellant has waived any argument that periods prior to the entry of the consent order should be included in the length of the delay in evaluating his speedy trial claim raised in connection with his fourth trial, regardless of the violations of his *Brady* rights in his previous trials. See *Currier*, 585 U.S. at 501-502 ("Retrial is generally allowed when

23

the defendant consents to a disposition that contemplates reprosecution." (cleaned up)).

(b) *Barker-Doggett Balancing Test.*

(i) *Length of the Delay Beyond the Point of Presumptive Prejudice.* Appellant argues that the trial court erred in weighing the length-of-the-delay factor "only slightly against the State." In applying the *Barker-Doggett* balancing test, the trial court was required to consider, as one factor among several, "the extent to which the delay stretche[d] beyond the bare minimum needed to trigger judicial examination of [Appellant's Sixth Amendment speedy trial] claim." *Doggett*, 505 U.S. at 652. As explained above, the trial court should have measured the length of the delay from the entry of the order granting him a new trial on July 7, 2021, to the start of his fourth trial on February 2, 2023, a period of approximately one year and seven months.

The trial court made no express finding regarding the extent to which this one-year-and-seven-month delay stretched beyond the point of presumptive prejudice. However,

> a delay approaching one year is sufficient in most cases to raise a presumption of prejudice and to warrant a more searching inquiry, keeping in mind that the delay that can be tolerated in a particular case depends to some extent on the complexity and seriousness of the charges.

*Heard*, 295 Ga. at 564-565 (cleaned up). Thus, at most, the length of the delay extended beyond the point of presumptive prejudice by a span of only seven months. We see no abuse of discretion in the trial court's decision to weigh the length-of-the-delay factor only slightly against the State in the balancing test. See *Doggett*, 505 U.S. at 655-656 ("While . . . presumptive prejudice cannot alone carry a Sixth Amendment [speedy trial] claim without regard to the other *Barker* criteria, it is part of the mix of relevant facts, and its importance increases with the length of delay." (citation omitted)); *United States v. Otero*, No. 23-1266, 2023 WL 8947133, at *1 (8th Cir. Dec. 28, 2023) (weighing a delay of approximately one year and six months "only slightly" in the defendant's favor after noting that the delay, while presumptively prejudicial, "did not stretch far beyond" the point of presumptive prejudice).

(ii) *Reason for the Delay*. The trial court weighed the reason-for-the-delay factor in the State's favor. Appellant contends that the trial court erred in doing so, but most of his arguments relate to periods that preceded the delay at issue. With respect to the relevant delay — the approximately one year and seven months from the entry of the order granting him a new trial on July 7, 2021, to the start of his fourth trial on February 2, 2023 — he does not allege, and the record does not suggest, any "deliberate delay to hamper the defense," which would be weighed heavily against the State. *Vermont v. Brillon*, 556 U.S. 81, 90 (129 SCt 1283, 173 LE2d 231) (2009) (cleaned up). To the contrary, the trial court expressly found that the prosecutors worked diligently to bring the case to trial during the relevant period, and the record fully supports that finding. Instead, Appellant argues merely that the trial court abused its discretion in failing to weigh the reason-for-the-delay factor "marginally" against the State. We see no abuse of discretion.

The trial court pointed to two reasons for the delay from July 7, 2021, to February 2, 2023: (1) the filing of "numerous Defense

26

motions" by Appellant; and (2) the recusal of two judges to whom the case was assigned.[2] The trial court found the periods of judicial reassignment to be "neutral," essentially concluding that neither Appellant nor the State was more to blame for them. The trial court then found that, on balance, the delay was beyond the State's control and exercised its discretion to weigh the reason-for-the-delay factor in the State's favor.

The record supports the trial court's finding that, as between Appellant and the State, Appellant was more to blame for the relevant delay. Appellant does not contend that the trial court erred in weighing the periods of judicial reassignment neutrally. As for the "numerous Defense motions," Appellant filed more than three dozen pretrial motions between July 7, 2021, and February 2, 2023, which took multiple hearings and months to resolve. See *Brillon*, 556 U.S. at 90 ("Delay caused by the defense weighs against the defendant

---

[2] The first of the two judges voluntarily recused himself in response to a motion to recuse filed by Appellant. The second judge explained that she recused herself in order to avoid any appearance of impropriety after Appellant subpoenaed the chief judge of her judicial circuit to testify at a hearing.

. . . ." (cleaned up)); *Doggett*, 505 U.S. at 656 (explaining that "pretrial delay is often both inevitable and wholly justifiable," that "the government may need time to," among other things, "oppose [the defendant's] pretrial motions," and that "we attach great weight to such considerations" (cleaned up)). See also *Jenkins*, 294 Ga. at 512 ("While defense counsel felt the responsibility to file and pursue the motions and pleas, it did not alter the fact that the case would have been brought to trial but for the need to hear and rule on them." (cleaned up)). In light of the numerous pretrial motions filed by Appellant, as well as the trial court's express finding of prosecutorial diligence in bringing the case to trial following the grant of a new trial, we hold that the trial court did not abuse its discretion in weighing the reason-for-the-delay factor in the State's favor (and thus against Appellant).

(iii) *Assertion of the Right*. Appellant filed a Demand for Speedy Trial on July 15, 2021, eight days after the entry of the order granting him a new trial. The trial court found that since that time, Appellant "consistently asserted his right to a speedy trial." The

trial court therefore exercised its discretion to weigh the assertion-of-the-right factor in Appellant's favor (and thus against the State). Appellant does not argue that the trial court abused its discretion in weighing this factor in his favor, and we see no abuse of discretion.

(iv) *Prejudice to the Defendant from the Delay*. In the speedy trial context, the United States Supreme Court has identified three types of prejudice that are relevant: (1) oppressive pretrial incarceration; (2) anxiety and concern resulting from public accusation; and (3) impairment of the accused's ability to defend against the charges due to dimming memories and loss of exculpatory evidence. See *Betterman*, 578 U.S. at 442; *Doggett*, 505 U.S. at 654. The trial court found that Appellant failed to show that he suffered any such prejudice in the approximately one year and seven months from the entry of the order granting him a new trial on July 7, 2021, to the start of his fourth trial on February 2, 2023, and therefore exercised its discretion to weigh the prejudice-to-the-defendant factor against Appellant.

Appellant contends that the trial court erred in finding that he failed to show prejudice, but again, most of his arguments relate to periods of time that preceded the relevant delay. For example, he points to his years on death row living under the threat of execution in an attempt to show that he suffered oppressive pretrial incarceration, circumstances that no longer existed after he was granted a new trial on July 7, 2021. And as evidence of his anxiety and concern resulting from public accusation, he points to his pro se filings during periods of time that preceded the grant of a new trial.

Appellant's claims of impairment to his defense likewise relate primarily to periods of time before July 7, 2021. For example, he argues that the delay deprived him of the opportunity to elicit testimony from his niece, Theresa Wilson, about statements that Brenda Smith allegedly made in 1995, because Wilson had died by the time of his fourth trial. But Wilson died on August 10, 2020, approximately 11 months before the grant of a new trial on July 7, 2021, so any prejudice to the defense from her unavailability cannot properly be attributed to the relevant delay. See *Higgenbottom v.*

30

*State*, 290 Ga. 198, 203 (719 SE2d 482) (2011) (holding that the death of a witness did not constitute prejudice to the defendant where the witness died "prior to the attachment of his constitutional rights to a speedy trial").

Appellant also points to memory loss by a number of witnesses due to the passage of time between the murders in 1995 and his fourth trial in 2023. However, the trial court found that Appellant failed to show prejudice from the dimming of memories, because the witnesses had testified under oath and been subject to cross-examination at Appellant's first three trials, and the transcripts from the prior trials had crystallized their memories and provided a source of testimony from witnesses who were no longer available. The trial court did not abuse its discretion in finding that Appellant failed to show prejudice in this regard. See *Jakupovic*, 287 Ga. at 207-208 (holding, in the context of a retrial, that the trial court did not abuse its discretion in finding that the defendant failed to show prejudice from the unavailability of two witnesses where transcripts of their testimony from his first trial were available).

31

Appellant argues as well that his defense was impaired by the inability of Pam Wilson and Alvin Brown to remember certain events from 1995 by the time of his fourth trial in 2023. At a hearing on April 22, 2022, Wilson denied having told Agent Williamson in 1995 that she saw Brenda Smith and her sister take something out of Appellant's car on the day of the murders. But the jury at Appellant's fourth trial was aware of Wilson's alleged statement, because Appellant asked Agent Williamson about it on cross-examination. Thus, Appellant has not shown prejudice to his defense from Wilson's lack of memory.

As for Brown, according to a Burke County Sheriff's Office incident report dated July 18, 1995, Frederico beat Alvin Brown with a board at a club in Gough, leaving Brown with cuts and scrapes around his right shoulder. At a hearing on November 17, 2022, Brown testified that he had no recollection of the incident, although he did not deny that it happened. Appellant argues that his defense was impaired, because Brown's memory loss left him unable to establish acts of violence by Frederico in the same year as

the murders. But the jury at Appellant's fourth trial knew that Frederico had pled guilty to two counts of felony murder in connection with the deaths of Brenda Palmer and Christine. Appellant therefore failed to show prejudice from Brown's lack of memory.

Finally, Appellant argues that at some point after his third trial in 2007, the State lost or destroyed potential biological evidence from the crime scene, which impaired his defense at his fourth trial. Specifically, he claims that his defense was impaired by his inability to perform independent testing on the two gauze pads that Agent Leonard used to wipe the skin between Christine's legs where a milky white liquid had pooled and then dissipated. However, the trial court expressly found that the gauze pads were not exculpatory, because the GBI performed serological testing on them in 1995, and the results were negative for the presence of semen. The trial court also noted that Appellant did not seek to independently test the gauze pads during his first three trials, when they were still available for testing. Appellant has not shown that the trial court's

finding that the potential biological evidence lacked exculpatory value is clearly erroneous.

In sum, the record supports the trial court's finding that Appellant failed to show that he suffered any relevant prejudice from this delay at issue. The trial court therefore did not abuse its discretion in weighing this factor against Appellant.

(v) *Conclusion.* The trial court weighed the assertion-of-the-right factor against the State and the length-of-the-delay factor slightly against the State but weighed the reason-for-the-delay factor and the prejudice-to-the-defendant factor against Appellant. The trial court did not abuse its discretion in the weights it assigned to these factors or in concluding, on balance, that the scales tipped against Appellant. Accordingly, the trial court did not err in rejecting Appellant's speedy trial claim.

3. Appellant claims that the trial court erred in denying his motion to dismiss the indictment on the ground that his due process rights were violated by the State's loss or destruction of the potential biological evidence discussed above. Alternatively, he claims that

the trial court erred in denying his request to instruct the jury that it could draw an adverse inference against the State from the loss or destruction of the evidence. Both claims fail.

"When the State suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld." *Illinois v. Fisher*, 540 U.S. 544, 547 (124 SCt 1200, 157 LE2d 1060) (2004) (cleaned up). However, due process "'requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'" Id. (quoting *Arizona v. Youngblood*, 488 U.S. 51, 57 (109 SCt 333, 102 LE2d 281) (1988)). The State's "failure to preserve potentially useful evidence does not constitute a denial of due process of law" unless the defendant can show "bad faith" on the part of the State in the failure to preserve the evidence. *Youngblood*, 488 U.S. at 58. The applicability of the bad-faith requirement does not depend on "the centrality of the

35

contested evidence to the prosecution's case or the defendant's defense." *Fisher*, 540 U.S. at 549.

The trial court determined that the potential biological evidence in this case had no apparent exculpatory value at the time that it was lost or destroyed. To the contrary, serological testing of the gauze pads was negative for the presence of semen. At best, the gauze pads were "potentially useful evidence" for the defense. *Youngblood*, 488 U.S. at 58. See also *Fisher*, 540 U.S. at 547-549 (distinguishing "material exculpatory evidence" from mere "potentially useful evidence" (cleaned up)). The trial court found that "nothing in the record indicates that the State acted in bad faith in failing to preserve" the potential biological evidence, and our review of the record confirms the trial court's finding in this regard. Thus, Appellant's due process rights were not violated, and the trial court did not err in denying his motion to dismiss the indictment based on an alleged due process violation.

Appellant also claims that the trial court erred in denying his oral request to instruct the jury that it could infer from the fact that

the State lost or destroyed the potential biological evidence that the results of laboratory analysis would have been favorable to the defense. However, there is no legal basis in Georgia law for giving a spoliation, or adverse inference, jury instruction in a criminal case. To the contrary, we have held that it is inappropriate to give a spoliation instruction in a criminal case, see *Howard v. State*, 307 Ga. 12, 18-19 & n.9 (834 SE2d 11) (2019), disapproved on other grounds by *Johnson v. State*, 315 Ga. 876, 889 n.11 (885 SE2d 725) (2023), even when the instruction is requested by the defendant, see *Radford v. State*, 251 Ga. 50, 53 (302 SE2d 555) (1983). Accordingly, the trial court did not err in refusing to give Appellant's requested jury instruction.[3]

4. Appellant asserts that the trial court violated his constitutional right to present a defense by excluding evidence of

---

[3] *Howard* and *Radford* relied on former OCGA § 24-4-22. However, that provision was carried forward substantially unchanged into Georgia's current Evidence Code as OCGA § 24-14-22, and it has no counterpart in the Federal Rules of Evidence. Accordingly, "our case law interpreting that former provision applies." *State v. Almanza*, 304 Ga. 553, 557 (820 SE2d 1) (2018).

"historical bias against him on the part of local law enforcement and prosecutors." This claim fails.

Appellant's claim is based on the trial court's pretrial rulings precluding him from introducing three categories of evidence: (1) evidence that the State violated his *Brady* rights at his first three trials by failing to disclose evidence favorable to the defense; (2) evidence that he filed a federal civil rights complaint against a deputy in the Burke County Sheriff's Office in 1978; and (3) evidence that the accusations against him in 1995 were used in a successful campaign to keep a superior court judge who was appointed shortly before the murders from being elected to a full term the following year.[4] Appellant does not contend that the trial court abused its discretion in excluding this evidence under the Georgia Evidence Code. See OCGA §§ 24-4-402 (relevant evidence generally is admissible; irrelevant evidence is inadmissible); 24-4-403 (relevant

---

[4] Appellant also refers in passing to the trial court's denial of his request to instruct the jury that it could draw an adverse inference against the State from the loss or destruction of the potential biological evidence. Appellant's jury instruction request is discussed in Division 3 above.

evidence may be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, or misleading the jury or considerations of undue delay or waste of time). Instead, he contends that the exclusion of the evidence pursuant to the Georgia Evidence Code violated his federal constitutional right to present a defense, citing *State v. Burns*, 306 Ga. 117, 121 (829 SE2d 367) (2019) ("The Due Process Clause in the Fourteenth Amendment . . . guarantees criminal defendants a meaningful opportunity to present a complete defense." (cleaned up)).

The United States Constitution guarantees criminal defendants the "right to present a defense." *United States v. Scheffer*, 523 U.S. 303, 315 (118 SCt 1261, 140 LE2d 413) (1998) (cleaned up). However, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Nevada v. Jackson*, 569 U.S. 505, 509 (133 SCt 1990, 186 LE2d 62) (2013) (cleaned up). The routine application of well-established rules of evidence like OCGA §§ 24-4-402 and 24-4-

403 to exclude irrelevant evidence, or relevant evidence whose probative value is substantially outweighed by factors such as the danger of unfair prejudice, confusion of the issues, or the potential to mislead the jury, does not violate a defendant's constitutional right to present a defense. See *Holmes v. South Carolina*, 547 U.S. 319, 326-327 (126 SCt 1727, 164 LE2d 503) (2006) (noting that such rules are "familiar and unquestionably constitutional," and stating that "the Constitution permits judges to exclude evidence that is repetitive, only marginally relevant[,] or poses an undue risk of harassment, prejudice, or confusion of the issues" (cleaned up)). The constitutional right to present a defense is abridged only "by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." Id. at 324 (cleaned up). See also id. at 326 (explaining that "the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote"). "Only rarely" has the United States Supreme Court held

40

that the "right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Jackson*, 569 U.S. at 509.

Appellant does not argue that OCGA §§ 24-4-402 and 24-4-403 are "arbitrary" or "disproportionate to the purposes they are designed to serve," and he has made no such showing here. Moreover, this case bears no resemblance to cases in which the United States Supreme Court has held that the exclusion of evidence pursuant to state evidentiary rules violated a defendant's constitutional right to present a defense. Cf., e.g., *Rock v. Arkansas*, 483 U.S. 44, 57-62 (107 SCt 2704, 97 LE2d 37) (1987) (holding that an evidentiary rule excluding all hypnotically refreshed testimony violated the defendant's constitutional right to present a defense where it prevented the defendant, who was accused of a killing to which she was the sole eyewitness, from testifying in her own defense); *Chambers v. Mississippi*, 410 U.S. 284, 294-302 (93 SCt 1038, 35 LE2d 297) (1973) (holding that the denial of a murder defendant's motion to treat as an adverse witness a man who had

confessed to the charged murder but later retracted the confession, combined with the exclusion of the testimony of three witnesses to whom the man had confessed on hearsay grounds, violated the defendant's constitutional right to present a defense); *Washington v. Texas*, 388 U.S. 14, 19-23 (87 SCt 1920, 18 LE2d 1019) (1967) (holding that a murder defendant's constitutional right to present a defense was violated when he was prevented from calling as a witness a man who had been convicted of the same murder based on two evidentiary statutes preventing persons charged or convicted as participants in committing the same crime from testifying for one another). Furthermore, Appellant does not cite, and we have not found, a case from any court holding that the exclusion of evidence alleged to show "historical bias" against a defendant "on the part of local law enforcement and prosecutors" under standard rules of evidence violates the defendant's constitutional right to present a defense.

Evidence relating to the State's prior *Brady* violations, Appellant's civil rights complaint from the late 1970s, and a 1996

judicial election was at best tangential to the issues at Appellant's fourth trial. Accordingly, the trial court did not abuse its discretion in excluding this evidence, much less violate Appellant's constitutional right to present a defense.

5. Appellant contends that the trial court erred in prohibiting him from questioning Agent Williamson about a drug-related shooting two months after the murders in which a man named Ricardo Chandler shot and killed Appellant's teenage son Wilbur. Wilbur was arguing with a woman who said that since he was selling drugs in her front yard, he should be sharing the profits with her. When Chandler intervened in the argument, Wilbur pulled out a gun and started shooting at him, and Chandler then shot and killed Wilbur in self-defense. According to Appellant, the prohibited questioning would have allowed him to show that Wilbur was the person who committed the murders with Frederico, not Appellant, and that the investigators unfairly focused on Appellant to the exclusion of other possible suspects.

> Certainly a defendant is entitled to introduce relevant and admissible testimony tending to show that another person committed the crime for which the defendant is tried. However, the proffered evidence must raise a reasonable inference of the defendant's innocence, and must directly connect the other person with the corpus delicti, or show that the other person has recently committed a crime of the same or similar nature.

*Klinect v. State*, 269 Ga. 570, 573 (501 SE2d 810) (1998) (citation omitted). See also OCGA § 24-4-403 (permitting trial courts to exclude even relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury"); *Holmes*, 547 U.S. at 327 & n.*, 330 (citing *Klinect* and explaining that rules like the one adopted in *Klinect* "are widely accepted" and are "designed . . . to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues"); *Moss v. State*, 298 Ga. 613, 616-617 & n.4 (783 SE2d 652) (2016) (applying *Klinect*'s rule regarding the admissibility of third-party guilt evidence in a case decided under Georgia's current Evidence Code based on OCGA § 24-4-403). Third-party guilt evidence "that merely

casts a bare suspicion on another or raises a conjectural inference as to the commission of the crime by another is not admissible." *Roberts v. State*, 305 Ga. 257, 261 (824 SE2d 326) (2019) (cleaned up). See also *Moss*, 298 Ga. at 616 (holding that the trial court did not abuse its discretion in preventing the defendant from questioning two witnesses about a prior shooting of the victim to show that there were other potential suspects in the victim's murder, because the court was not required to allow the defendant to introduce evidence "based purely on rumor, speculation, and conjecture" (cleaned up)).

The testimony that Appellant sought to elicit from Agent Williamson would not have raised a reasonable inference of Appellant's innocence. At most, it would have cast "bare suspicion" on Wilbur or raised a "conjectural inference" that he was somehow involved in the murders with Appellant and Frederico. *Roberts*, 305 Ga. at 261 (cleaned up). It also would not have shown that Agent Williamson unfairly focused on Appellant to the exclusion of a viable alternate suspect, as there was no evidence of animus on the part of Wilbur toward Brenda Palmer or Christine and no evidence that

Wilbur had the opportunity to commit the murders, either alone or with Appellant and Frederico. Nothing linked Wilbur to the murders. See *Roberts*, 305 Ga. at 261 ("Even if opportunity could be inferred, nothing linked this third party to the murder." (cleaned up)). To the extent that Appellant was attempting to show Wilbur's participation in the murders based solely on the fact that he had "recently committed a crime of the same or similar nature," *Klinect*, 269 Ga. at 573, the testimony that he sought to elicit was inadmissible character evidence. See OCGA § 24-4-404 (b) ("Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. . . ."). Accordingly, the trial court did not abuse its discretion in precluding Appellant from questioning Agent Williamson about the drug-related shooting with no apparent connection to this case that resulted in Wilbur's death two months after the murders.

6. Finally, Appellant claims that the cumulative effect of the trial court's errors deprived him of a fundamentally fair trial. See

*State v. Lane*, 308 Ga. 10, 17-18 (838 SE2d 808) (2020). However, as explained above, Appellant has not shown any error by the trial court. Accordingly, cumulative error analysis is inapplicable. See *Wynn v. State*, 313 Ga. 827, 840 (874 SE2d 42) (2022) ("Cumulative error analysis . . . requires an appellant to show that at least two errors were committed in the course of the trial." (cleaned up)).

*Judgment affirmed. All the Justices concur.*

Decided March 5, 2024.

Murder. Burke Superior Court. Before Judge Palmer, Senior Judge.

*Josh D. Moore, Thea A. Delage*, for appellant.

*Jared T. Williams, District Attorney, Joshua B. Smith, John M. Kraft, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Meghan H. Hill, Senior Assistant Attorneys General, Stephany J. Luttrell, Assistant Attorney General*, for appellee.